AO 91 (Rev. 11/11) Criminal Complaint                                      AUSA Erin E. Kelly (312) 886-9083

**FILED**
9/20/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ALAN MORA-MARTINEZ, and
ALVARO PONCE-CANSINO

CASE NUMBER: 21 CR 584

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about September 16, 2021 and on or about September 17, 2021, at Cicero, in the Northern District of Illinois, Eastern Division, the defendants ALAN MORA-MARTINEZ and ALVARO PONCE-CANSINO violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | ALAN MORA-MARTINEZ and ALVARO PONCE-CANSINO did conspire with each other to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

CLAY T. WILDT
Special Agent, Homeland Security Investigations
(HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 20, 2021

_Judge's signature_

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge

_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## AFFIDAVIT

I, CLAY T. WILDT, being duly sworn, state as follows:

1.      I am a Special Agent with the Homeland Security Investigations (HSI), and have been so employed for 1 year.  I previously was employed for 6 years with U.S. Customs and Border Protection.   My current responsibilities include the investigation of narcotics trafficking offenses.

2.      This affidavit is submitted in support of a criminal complaint alleging that ALAN MORA-MARTINEZ ("MORA-MARTINEZ") and ALVARO PONCE-CANSINO ("PONCE-CANSINO") have violated Title 21, United States Code, Section 846.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MORA-MARTINEZ and PONCE-CANSINO with conspiracy to possess with intent to distribute and distribute a controlled substance, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my review of recorded calls and text messages, and recorded interviews.

**FACTS SUPPORTING PROBABLE CAUSE**

4.    On or about September 16, 2021, at HSI's direction, a confidential source ("CS-1")[1] contacted ALAN MORA-MARTINEZ and began negotiating the purchase of five kilograms of cocaine.  When MORA-MARTINEZ spoke to CS-1, he was supposed to be working as confidential source for HSI and was not permitted to engage in unauthorized narcotics transactions.  MORA-MARTINEZ, however, did not disclose to HSI that he had agreed to sell cocaine to CS-1, and lied to HSI about the substance of his/her conversation with CS-1.  On or about September 17, 2021, MORA-MARTINEZ agreed to sell CS-1 five kilograms of cocaine for $33,500 per kilogram, and informed CS-1 that the transaction would occur that evening in Cicero, Illinois.

5.    At approximately 6:58 p.m. on September 17, 2021, CS-1 and an undercover law enforcement officer (the "UC") arrived at the location provided to CS-1 by MORA-MARTINEZ to purchase the narcotics.  Once CS-1 and the UC arrived at the meeting location in Cicero, they were met by an individual later identified as ALVARO PONCE-CANSINO, who distributed approximately 5.9 kilograms of cocaine in exchange for what, unbeknownst to him, was sham currency.

---

[1]    CS-1 has been cooperating with law enforcement officials since on or about September 16, 2021.  CS-1 began his/her cooperation with HSI in exchange for charging and sentencing consideration regarding a September 16, 2021 seizure of approximately 1.34 kilograms of marijuana, a firearm, and other items used to distribute marijuana, including scales and bulk quantities of packaging from CS-1's vehicle.  CS-1 is also currently charged in the State of Michigan with a felony firearms offense and that case is pending. CS-1 has proven to be a reliable source of information, as much of his/her information has been independently corroborated, as explained in this affidavit, to include recorded conversations and the seizure of approximately 5.9 kilograms of cocaine.  To my knowledge, CS-1's information has not been found to be false or misleading.

6.     At about the same time as CS-1 and the UC met with PONCE-CANSINO at the meeting location, law enforcement observed MORA-MARTINEZ drive past the deal location and took him into custody for questioning.  After MORA-MARTINEZ's arrest, MORA-MARTINEZ initially stated that he had set up the cocaine transaction in his role as a confidential informant for HSI's benefit, and later told law enforcement that was at the deal location because he wanted to feel powerful. During a consensual search of MORA-MARTINEZ's residence, law enforcement seized an assault rifle, a scope, magazines, and various ammunition. MORA-MARTINEZ is not lawfully present in the United States and is not permitted to possess a gun.

### *CS-1 Arranged to Purchase Cocaine from MORA-MARTINEZ*

7.     On or about September 16, 2021, HSI conducted a traffic stop of CS-1 that resulted in HSI's seizure of approximately 1.34 kilograms of marijuana, a firearm, and other items used to distribute marijuana, including scales and bulk quantities of packaging.  After CS-1's arrest, law enforcement officials conducted a video and audio recorded interview with him/her.  At the beginning of the interview, CS-1 waived his/her *Miranda* rights and agreed to speak with law enforcement officials without an attorney present.

8.     During the interview, CS-1 told HSI that he/she periodically sold heroin and recently sold approximately 100 grams of heroin to an individual whom he/she knew as "Alan" for $5,500.  CS-1 gave HSI a physical description of Alan and stated

that he/she communicated with Alan on Snapchat through the account display name alan_mora7405 (the "Alan Mora Account").

9.     HSI determined that the person CS-1 referred to as Alan is MORA-MARTINEZ as follows:  (a) CS-1's description of Alan's physical appearance, which was consistent with HSI's observations of MORA-MARTINEZ's appearance, (b) CS-1's description of the heroin transaction, and (c) CS-1's identification of the Alan Mora Account, which uses the name Adam Mora.  Unbeknownst to CS-1, at the time of his/her prior distribution of heroin to MORA-MARTINEZ, MORA-MARTINEZ was cooperating with law enforcement, and the transaction CS-1 described to HSI was a controlled purchase of heroin that MORA-MARTINEZ had conducted at law enforcement's direction.

10.     During the interview, CS-1 agreed to provide law enforcement officials with information about narcotics trafficking in the Chicago area.  On or about September 16, 2021, at the direction of law enforcement and in my presence, CS-1 had a consensually-recorded call with MORA-MARTINEZ through the Snapchat application.[2]  During their conversation:

---

[2]     Law enforcement officials determined that MORA-MARTINEZ was the user of the Alan Mora Account as follows:  (1) CS-1 told law enforcement that he/she had MORA-MARTINEZ's contact information, and CS-1 contacted MORA-MARTINEZ through Snapchat in law enforcement's presence; (2) I previously have spoken to MORA-MARTINEZ through his work as a confidential source, and, based on my contemporaneous monitoring of the call between CS-1 and the individual using the ALAN MORA Account on September 16, 2021, I recognized the voice of the person who spoke to CS-1 as MORA-MARTINEZ's voice; and (3) as discussed below, on September 17, 2021, MORA-MARTINEZ arrived at the scene of the five-kilogram cocaine transaction that he had previously discussed with CS-1 using the Alan Mora Account; and (4) in a later post-arrest interview with MORA-MARTINEZ, MORA-MARTINEZ acknowledged having arranged the distribution of cocaine to CS-1 on September 17, 2021.

    a.    MORA-MARTINEZ asked CS-1 to sell him one-half to one kilogram of heroin. CS-1 responded that his/her heroin supply had disappeared and it would be difficult to quickly obtain heroin in a bulk quantity.

    b.    CS-1 then asked whether MORA-MARTINEZ could sell CS-1 kilogram quantities of cocaine. MORA-MARTINEZ agreed to sell CS-1 four kilograms and stated that they would confirm additional details of the transaction, such as the price of the cocaine and meeting location, on a future date.

11.    Approximately 90 minutes after he spoke to CS-1, MORA-MARTINEZ contacted your affiant by phone. This call was not recorded. During the call, MORA-MARTINEZ told me that he had arranged to purchase between one-half and one kilograms of heroin from CS-1.

12.    Because I had just listened to the conversation between MORA-MARTINEZ and CS-1 in real-time as it occurred in my presence, I knew that MORA-MARTINEZ's statement that he had brokered a deal to buy heroin from CS-1 was not truthful. MORA-MARTINEZ did not tell me that he and CS-1 had discussed a cocaine transaction or that MORA-MARTINEZ had agreed to sell CS-1 four kilograms of cocaine.

13.    On or about September 17, 2021, between approximately 11:37 a.m. and 1:00 p.m., CS-1 had four consensually-recorded conversations with MORA-MARTINEZ over Snapchat about the cocaine sale. Based on my review of these recordings, during those conversations:

      a.    MORA-MARTINEZ offered to sell CS-1 five kilograms of cocaine for $33,500 per kilogram.

      b.    CS-1 told MORA-MARTINEZ that "his guy" (an undercover law enforcement official) would accompany CS-1 with the cash for the transaction.

      c.    MORA-MARTINEZ stated,[3] "you're gonna throw the bag [containing the narcotics proceeds] in the truck, somebody's gonna throw a bag [containing the kilograms of cocaine] in his [CS-1's associate, the UC] car, whichever way it goes, we're just swapping out and going on about our merry ways. That's it."

      d.    MORA-MARTINEZ stated that:

      i.    The transaction would occur between 6:00 and 7:00 p.m. that same evening in the parking lot of a restaurant in Cicero, Illinois ("Business A").

      ii.    A black Chevrolet Silverado would deliver the cocaine to the deal location.

14.    Based on my training and experience and knowledge of the investigation, I believe that in the above-referenced exchanges: (a) MORA-MARTINEZ agreed to sell CS-1 five kilograms of cocaine for $167,500; (b) MORA-MARTINEZ and CS-1 agreed that a person would accompany CS-1 to deliver the cash

---

[3]    Based on my conversations with other law enforcement officers and my personal knowledge, it is my understanding that the calls and meetings set forth in this affidavit were recorded by law enforcement but have not yet been transcribed. As such, for each of the calls discussed in this affidavit, I have relied on verbal summaries provided by CS-1 or other law enforcement agents. At various points in the affidavit, I have offered interpretations of certain intercepted conversations in brackets. These interpretations are based on information provided by CS-1, conversations with other officers and agents, my knowledge of the investigation, the context of the conversations, the results of physical surveillance, and my training and experience in general.

payment for the narcotics; and (c) between 6:00 and 7:00 p.m. that evening, CS-1 would meet a drug courier sent by MORA-MARTINEZ at a restaurant in Cicero, Illinois, to exchange the narcotics and cash.

15. MORA-MARTINEZ did not disclose the cocaine transaction to law enforcement officials at any time before the execution of the deal.

### *PONCE-CANSINO Delivered Five Kilograms of Cocaine to the UC at the Agreed Upon Location and Time*

16. On or about September 17, 2021, at approximately 6:15 p.m., law enforcement met with CS-1 at a predetermined location and searched his/her person and vehicle for any contraband and large amounts of U.S. currency with negative results. CS-1 was equipped with an audio and video recording device, and the UC was equipped with an audio recording device and transmitter that enabled law enforcement to listen contemporaneously to the narcotics transaction. The UC then drove with CS-1 in CS-1's vehicle to Business A's parking lot.

17. At approximately 6:32 p.m., law enforcement established surveillance near Business A. According to law enforcement officials conducting surveillance:

a. At approximately 6:58 p.m., CS-1 and the UC arrived at the deal location.

b.      At approximately 7:20 p.m., a dark-colored Chevrolet Silverado with registration 2914129B pulled into Business A's parking lot and parked near CS-1's vehicle.[4]

c.      At approximately the same time, law enforcement officials observed a black Chevrolet Suburban with registration BL43339 drive past the parking lot. Through law enforcement officials with HSI's prior interactions with MORA-MARTINEZ as a confidential source, law enforcement officials recognized the Chevrolet Suburban as a vehicle driven by MORA-MARTINEZ.

d.      The UC exited CS-1's vehicle and walked to the Chevrolet Silverado. The UC opened the front passenger side door of the Chevrolet Silverado, entered the vehicle, and placed a backpack containing sham cash on the floor of the vehicle, directly below the center console. PONCE-CANSINO, the driver and lone occupant of the Chevrolet Silverado, displayed a duffel bag to the UC that contained five bundles of a substance.[5] Photographs of the duffle bag and bundles of cocaine are below:

---

[4]      Law enforcement officials reviewed records from the Illinois Secretary of State and determined that the Chevrolet Silverado was registered to Individual A at an address on South 11th Street in Maywood, Illinois. As discussed below, PONCE-CANSINO's driver's license registration listed that address as his residence.

[5]      Upon his arrest, PONCE-CANSINO identified himself by name. Law enforcement officials also obtained from PONCE-CANSINO an Illinois driver's license in the name of "Alvaro Ponce-Cansino," which contained a photograph matching PONCE-CANSINO's appearance that included the South 11 Street address in Maywood, Illinois, which is consistent with the registration information for the Chevrolet Silverado.



18.     Through the UC's audio transmitter, law enforcement heard the sound of two distinct zipper noises, indicating that two bags had been opened, and heard the UC and PONCE-CANSINO agree that the contents of the bags "looked good." Upon hearing that PONCE-CANSINO was satisfied with the payment for the narcotics, law enforcement arrested PONCE-CANSINO.

19.     Law enforcement officials seized the bag with the five bundles. Law enforcement officials determined that the bundles weighed approximately 5.9 kilograms and field-tested positive for the presence of cocaine.

### Arrest of MORA-MARTINEZ Near the Deal Location

20.     At about the same time law enforcement officials met with PONCE-CANSINO to purchase the kilograms of cocaine, law enforcement officials saw MORA-MARTINEZ's Chevrolet Suburban slowly drive past Business A's parking lot. Suspecting that MORA-MARTINEZ was present in order to observe the narcotics transaction, a law enforcement officer yelled, "MORA," at the passing vehicle. According to a law enforcement officer on surveillance, the driver looked in the

officer's direction and sped away. Shortly thereafter, MORA-MARTINEZ made phone calls to HSI agents, but the agents did not answer them due to their ongoing enforcement actions.

21.     At approximately 7:36 p.m., law enforcement officials located and performed an investigative stop of the Chevrolet Suburban in the vicinity of Business A. Law enforcement officials identified MORA-MARTINEZ as the driver and sole occupant of the vehicle. After law enforcement officers curbed his vehicle, he stated, in effect, "I was just going to call you." Law enforcement took MORA-MARTINEZ into custody for further questioning.

22.     After their arrests, law enforcement officials transported PONCE-CANSINO and MORA-MARTINEZ in separate vehicles to the Berwyn Police Department. During his ride to the police station, MORA-MARTINEZ made unsolicited statements to law enforcement officials that he set up the cocaine transaction for HSI in his role as a confidential source. MORA-MARTINEZ also stated that he wished to remain cooperative with law enforcement and had nothing to hide at his residence or on his cellular phone. These statements were unrecorded.

23.     Upon their arrival at the Berwyn Police Department, PONCE-CANSINO and MORA-MARTINEZ were placed into separate interview rooms that were equipped with audio and video recording devices. PONCE-CANSINO asserted his right to counsel and did not speak to law enforcement.

24.     MORA-MARTINEZ orally and in writing waived his *Miranda* rights and agreed to speak with law enforcement officials without an attorney present. Law

enforcement asked MORA-MARTINEZ why he was present at the cocaine transaction. MORA-MARTINEZ responded that he "wanted to feel powerful" and observe the status of the transaction.

25. MORA-MARTINEZ gave law enforcement officials his verbal and written consent to search (1) his residence in Cicero, Illinois ("MORA-MARTINEZ Residence"), (2) the cellular telephone that MORA-MARTINEZ had in his possession when he was arrested ("MORA-MARTINEZ Phone"), and (3) the numerous vehicles present on his property.

26. According to law enforcement officials present for the search of MORA-MARTINEZ Residence, during the search, law enforcement officials found an Anderson Manufacturing AM-15 assault rifle bearing serial number 19225917 (the "Assault Rifle") in a dresser inside the bedroom that MORA-MARTINEZ shared with his partner, Individual B. Law enforcement officials also found and seized from MORA-MARTINEZ Residence: (1) a UTG rifle scope; (2) one 30-round magazine; (3) two 9-millimeter handgun magazines; and (4) over 20 rounds of ammunition.[6] A photograph of the Assault Rifle is included below:

---

[6] According to the law enforcement officials who arrived at MORA-MARTINEZ Residence to conduct the search, Individual B stated that there were no firearms inside the home and that she is not a gun owner. Law enforcement database queries indicate that neither MORA-MARTINEZ nor Individual B had a Firearm Owner's Identification Document ("FOID") or a Concealed Carry License ("CCL").



27.     I attended MORA-MARTINEZ's post-arrest interview.  After I and other law enforcement officials questioning MORA-MARTINEZ learned about the items found during the residential search, law enforcement officials asked MORA-MARTINEZ whether he recalled receiving HSI's admonishments that he was prohibited by law from possessing and using firearms,[7] and MORA-MARTINEZ recalled being so informed by HSI.  Law enforcement asked MORA-MARTINEZ about the Assault Rifle found in his home and MORA-MARTINEZ stated that a friend periodically stays with him to travel to a nearby gun range and leaves firearms at his residence.

---

[7]     During HSI's initial and subsequent meetings with MORA-MARTINEZ after he became a confidential source, HSI told him that he was not allowed to possess or use firearms while cooperating with law enforcement. MORA-MARTINEZ had asked law enforcement officials whether he could possess a firearm for personal protection in his home, and law enforcement responded that he is not permitted by law to possess firearms because he is an illegal alien and has a prior felony conviction.

28.     While agents were questioning MORA-MARTINEZ, law enforcement officials reviewed MORA-MARTINEZ Phone.  Law enforcement officials found text messages between MORA-MARTINEZ and a contact saved in his phone as "Porkchop."  In those text messages, MORA-MARTINEZ stated, "Come out here I'll text you the address," and "We got Hella guns and can shoot em.  I for my AR15 out here."  Law enforcement inquired about those text messages and asked MORA-MARTINEZ why he referred to the AR-15 as his gun. MORA-MARTINEZ responded that he was "just showing off."

29.     Based on the recovery of the Subject Firearm and ammunition inside MORA-MARTINEZ Residence, the text messages discussed above where MORA-MARTINEZ claimed that an AR-15 (the Assault Rifle) belonged to him, and Individual B's lack of knowledge of the presence of firearms in MORA-MARTINEZ Residence, I believe that MORA-MARTINEZ possessed the Assault Rifle and ammunition recovered from MORA-MARTINEZ Residence.

## **CONCLUSION**

30.     Based on the foregoing, there is probable cause to believe that, between on or about September 16, 2021 and on or about September 17, 2021, the above-listed individuals committed the offense listed in the criminal complaint.


FURTHER AFFIANT SAYETH NOT.

_____
CLAY T. WILDT
Special     Agent,     Homeland     Security
Investigations


SWORN TO AND AFFIRMED by telephone September 20, 2021.

_____
Honorable YOUNG B. KIM
United States Magistrate Judge